SYLLABUS

This syllabus is not part of the Court's opinion.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Court.  In the interest of brevity, portions of an opinion may not have been summarized.

**Sun Life Assurance Company of Canada v. Wells Fargo Bank, N.A.**
**(A-49-17) (080669)**

**Argued January 29, 2019 -- Decided June 4, 2019**

**RABNER, C.J., writing for the Court.**

In New Jersey and elsewhere, no one can procure insurance on a stranger's life and receive the benefits of the policy.  Betting on a human life in that way, with the hope that the person will die soon, not only raises moral concerns but also invites foul play.  For those reasons, state law allows a policy to be procured only if the benefits are payable to someone with an "insurable interest" in the person whose life is insured.  N.J.S.A. 17B:24-1.1(b).

In April 2007, Sun Life Assurance Company of Canada received an application for a $5 million insurance policy on the life of Nancy Bergman.  The application listed a trust as the sole owner and beneficiary of the policy.  Ms. Bergman's grandson signed as trustee.  The other members of the trust were all investors, and all strangers to Ms. Bergman.  The investors paid most if not all of the policy's premiums.

Sun Life received an inspection report that listed Ms. Bergman's annual income as more than $600,000 and her overall net worth at $9.235 million.  In reality, her income was about $3000 a month, and her estate was later valued at between $100,000 and $250,000.  Although Ms. Bergman represented that she had no other life insurance policies, five policies were taken out on her life in 2007, for a total of $37 million.

Sun Life issued the policy on July 13, 2007.  At the time, the trust was the sole owner and beneficiary.  The policy had an incontestability clause that barred Sun Life from challenging the policy -- other than for non-payment of premiums -- after it had been "in force during the lifetime of the Insured" for two years.  About five weeks after the policy was issued, the grandson resigned as trustee and appointed the investors as successor co-trustees.  The trust agreement was amended so that most of the policy's benefits would go to the investors, who were also empowered to sell the policy.

More than two years later, the trust sold the policy and the investors received nearly all of the proceeds from the sale.  Wells Fargo Bank, N.A. eventually obtained the policy in a bankruptcy settlement and continued to pay the premiums.

1

After Nancy Bergman passed away in 2014, Wells Fargo sought to collect the policy's death benefit.  Sun Life investigated the claim, uncovered the discrepancies noted above, and declined to pay.  Instead, Sun Life sought a declaratory judgment that the policy was void ab initio, or from the beginning.  Wells Fargo counterclaimed for breach of contract and sought the policy's $5 million face value; if the court voided the policy, Wells Fargo sought a refund of the premiums it paid.

The United States District Court for the District of New Jersey partially granted Sun Life's motion for summary judgment.  The court found that New Jersey law applied and concluded "that this was a STOLI [(stranger-originated life insurance)] transaction lacking insurable interest in violation of [the State's] public policy. . . .  As such, it should be declared void ab initio."  The court also granted Wells Fargo's motion to recover its premium payments, reasoning that "Wells Fargo is not to blame for the fraud here" and that "[a]llowing Sun Life to retain the premiums would be a windfall to the company."

Both parties appealed.  Finding no dispositive New Jersey case law, the United States Court of Appeals for the Third Circuit certified two questions of law to this Court:

1.  Does a life insurance policy that is procured with the intent to benefit persons without an insurable interest in the life of the insured violate the public policy of New Jersey, and if so, is that policy void ab initio?

2.  If such a policy is void ab initio, is a later purchaser of the policy, who was not involved in the illegal conduct, entitled to a refund of any premium payments that they made on the policy?

**HELD:**  The Court answers both parts of the first certified question in the affirmative:  a life insurance policy procured with the intent to benefit persons without an insurable interest in the life of the insured does violate the public policy of New Jersey, and such a policy is void at the outset.  In response to the second question, a party may be entitled to a refund of premium payments it made on the policy, depending on the circumstances.

1.  The Court reviews the history of wagering concerns associated with life insurance and the development of the insurable interest requirement in response to those concerns.  In New Jersey, the Legislature adopted the current insurable interest requirement in 1968. The Legislature expressly imposed an insurable interest requirement and thus superseded dated case law holding that a policy could be valid without an insurable interest.  N.J.S.A. 17B:24-1.1(a) outlines situations in which an individual has an insurable interest, as well as circumstances under which a corporation or a nonprofit or charitable entity has an insurable interest in the lives of its employees, officers, or others.  Critical to the questions presented in this case, section (b) of N.J.S.A. 17B:24-1.1 bars procurement of a life insurance policy payable to someone who lacks an insurable interest in the life of the insured.  (pp. 8-13)

2

2. Just as all New Jersey insurance policies must be based on an insurable interest, they must also contain an incontestability clause. See N.J.S.A. 17B:25-4 ("There shall be a provision that the policy . . . shall be incontestable, except for nonpayment of premiums, after it has been in force during the lifetime of the insured for a period of 2 years from its date of issue."). Incontestability clauses, however, are not a bar to all defenses. A majority of courts have held that the lack of an insurable interest can be asserted as a defense even after a policy has become incontestable. As the Delaware Supreme Court has explained, "if a life insurance policy lacks an insurable interest at inception, it is void ab initio because it violates . . . clear public policy against wagering. It follows, therefore, that if no insurance policy ever legally came into effect, then neither did any of its provisions, including the statutorily required incontestability clause." PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr., 28 A.3d 1059, 1067-68 (Del. 2011). (pp. 14-16)

3. Although life insurance policies must be payable to a person with an insurable interest when they are procured, policies can be sold later on -- including to individuals who would not have been able to buy the policy originally because they lacked an insurable interest. In New Jersey, life insurance policies may be sold subject to the regulatory scheme outlined in the Viatical Settlements Act, N.J.S.A. 17B:30B-1 to -17. Aside from limited exceptions, the law bars policyholders from entering into a viatical or life settlement contract -- and thus transferring the policy benefit to a stranger -- for two years from the date the policy was issued. N.J.S.A. 17B:30B-10(a). STOLI policies are a subset of life settlements in which a life settlement broker persuades a senior citizen to take out a life insurance policy for a cash payment or some other current benefit arranged with a life settlement company. Generally, an investor funds a STOLI policy from the outset, which makes it possible to obtain a policy with a high face value. STOLI arrangements thus present a significant legal problem: the investors have no insurable interest in the life of the insured. As a result, the transactions pose questions in light of New Jersey's policy against wagering, which finds expression in the State Constitution and in statutory provisions. (pp. 16-22)

4. The first part of question one asks whether "a life insurance policy that is procured with the intent to benefit persons without an insurable interest in the life of the insured violate[s] the public policy of New Jersey." Consider a policy that strangers financed or caused to be procured for Mary's life. When the policy is issued, Mary's daughter is the named beneficiary or the trustee of an irrevocable trust that owns the policy. The trust thus has an insurable interest at the time the contract for the policy is made. But the strangers actually have a side agreement with Mary or her daughter to transfer control of the trust, the beneficial interest in the policy, or ownership of the policy, at a later time. In short, the outside investors who funded the policy effectively control it from the start. It would elevate form over substance to suggest that the policy satisfies the insurable interest requirement. The policy is a cover for a wager on Mary's life by a stranger. It therefore violates public policy. STOLIs commonly involve life insurance policies procured and financed by investors -- strangers -- who have no insurable interest in the

3

life of the insured yet, from the outset, are the ultimate intended beneficiaries of the policy. That type of arrangement runs afoul of New Jersey's insurable interest requirement and counters the principle underlying the requirement: the individual with an insurable interest must have an interest in the continued life of the insured rather than in his early death. The Court explains why, contrary to Wells Fargo's assertions, sections (c) and (d) of the insurable interest statute do not call for a different result and notes that an incontestability provision does not bar a challenge to a STOLI policy. (pp. 23-28)

5. Imagine Mary's daughter procured the above policy, paid the premiums for a few months, and then transferred her role as trustee, or the ownership or beneficial interest in the policy, to strangers in exchange for reimbursement and compensation. Suppose as well that Mary's daughter intended to do so from the start. That arrangement likewise might be little more than a cover for a wager on Mary's life, and it raises questions about the manner in which the policy was procured. A number of considerations could affect the validity of the policy: the nature and timing of any discussions between the purchaser and the strangers; the reasons for the transfer; and the amount of time the policy was held; among other factors. Courts cannot devise a bright-line rule for the type of transaction this second hypothetical presents. The area is best addressed by the Legislature and the Division of Banking and Insurance (DOBI). (pp. 28-30)

6. Thirty states have enacted anti-STOLI legislation to date. Two model acts have been designed to stop STOLIs. Anti-STOLI legislation has been proposed multiple times in New Jersey. From 2009 through 2014, ten bills were introduced. None were passed or enacted. Despite suggestions by Wells Fargo, it is difficult to discern the Legislature's intent from bills it has not passed. (pp. 30-32)

7. According to DOBI, absent an insurable interest, a life insurance policy is a "pure gamble" in violation of N.J.S.A. 17B:24-1.1 and "the anti-gambling provisions of both the New Jersey Constitution and New Jersey statutes." DOBI's views are entitled to considerable weight in this area, which falls within its field of expertise. (pp. 32-33)

8. The Court reviews cases from other jurisdictions that have considered similar questions. Notably, three jurisdictions that found that STOLI policies passed muster under the states' then-existing laws -- all three have since adopted anti-STOLI legislation -- interpreted statutory provisions that either limited the duration of an insurable interest requirement to when the policy took effect or explicitly permitted the immediate transfer of policies. New Jersey statutory law does not permit the immediate transfer of a life insurance policy to people or entities that lack an insurable interest. (pp. 33-41)

9. The Court stresses that it does not suggest that life settlements in general are contrary to public policy. Valid life insurance policies are assets that can be sold. An established secondary market exists for the sale of valid policies -- at least two years after they are issued or earlier in certain cases -- to investors who lack an insurable interest. (pp. 41-42)

10.  The first certified question poses a supplemental inquiry:  If the policy procured violates New Jersey's public policy, is it void ab initio?  When an insurance policy violates public policy, it is as though the policy never came into existence.  The policy would be void from the outset.  (pp. 42-43)

11.  The second certified question asks, "If such a policy is void ab initio, is a later purchaser of the policy, who was not involved in the illegal conduct, entitled to a refund of any premium payments that they made on the policy?"  The traditional rule -- that courts leave the parties to a void contract as they are rather than assist an illegal contract -- has evolved over time.  Under the more modern view, equitable factors can be considered to determine the proper remedy.  The Court reviews several decisions in which such factors were considered by courts assessing STOLI policies and observes that the fact-sensitive approach adopted in those cases is sound.  To decide the appropriate remedy, trial courts should develop a record and balance the relevant equitable factors.  Those factors include a party's level of culpability, its participation in or knowledge of the illicit scheme, and its failure to notice red flags.  Depending on the circumstances, a party may be entitled to a refund of premium payments it made on a void STOLI policy, particularly a later purchaser who was not involved in any illicit conduct.  The Court notes that the District Court considered equitable principles and fashioned a compromise award but does not comment on the award itself.  (pp. 43-48)

**JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in CHIEF JUSTICE RABNER's opinion.  JUSTICE ALBIN did not participate.**

SUPREME COURT OF NEW JERSEY
A-49 September Term 2017
080669

Sun Life Assurance
Company of Canada,

Plaintiff-Respondent,

v.

Wells Fargo Bank, N.A.,
as Securities Intermediary,

Defendant-Appellant.

On certification of questions of law from the
United States Court of Appeals for the Third Circuit.

| Argued | Decided |
|--------|---------|
| January 29, 2019 | June 4, 2019 |

Julius A. Rousseau, III, of the New York and North
Carolina bars, admitted pro hac vice, argued the cause for
appellant (Arent Fox, attorneys; Julius A. Rousseau, III,
and Eric Biderman, on the briefs).

Charles J. Vinicombe argued the cause for respondent
(Cozen O'Connor, attorneys; Charles J. Vinicombe,
Michael J. Miller, and Sarah E. Kalman, on the briefs).

Raymond R. Chance, III, Assistant Attorney General,
argued the cause for amicus curiae State of New Jersey
Department of Banking and Insurance (Gurbir S. Grewal,
Attorney General, attorney; Melissa H. Raksa, Assistant
Attorney General, of counsel; and James A. Carey, Jr.,

1

Deputy Attorney General, and Adam B. Masef, Deputy
Attorney General, on the brief).

Joseph D. Jean submitted a brief on behalf of amicus
curiae Institutional Longevity Markets Association
(Pillsbury Winthrop Shaw Pittman, attorneys).

Michael M. Rosensaft submitted a brief on behalf of
amicus curiae Life Insurance Settlement Association
(Katten Muchin Rosenman, attorneys).

---

CHIEF JUSTICE RABNER delivered the opinion of the Court.

---

In New Jersey and elsewhere, no one can procure a life insurance policy

on a stranger's life and receive the benefits of the policy.  Betting on a human

life in that way, with the hope that the person will die soon, not only raises

moral concerns but also invites foul play.  For those reasons, state law allows a

policy to be procured only if the benefits are payable to someone with an

"insurable interest" in the person whose life is insured.  N.J.S.A. 17B:24-

1.1(b).  The beneficiary can be the insured herself, a close relative, a person,

corporation, or charity with certain financial ties to the insured, or select

others.  N.J.S.A. 17B:24-1.1(a).

This case arises out of certified questions of law from the United States

Court of Appeals for the Third Circuit.  We consider whether the swift transfer

of control over a life insurance policy and its benefit, from a named

2

beneficiary who had an insurable interest to investors who did not, satisfies New Jersey's insurable interest requirement.

Here, a group of investors paid for a life insurance policy through a trust. The insured was a stranger to them. When the policy was issued, the insured's grandson was the beneficiary. About five weeks later, the trust was amended and the strangers who invested in the policy became its beneficiaries. In short, the insurable interest requirement appeared to have been satisfied at the moment the policy was purchased, but the plan from the start was to transfer the benefits to strangers soon after the policy was issued.

The policy in question is known as a "STOLI" -- a stranger-originated life insurance policy. Because such policies can be predatory and may involve fraud, other states have adopted legislation that bars them. We now consider STOLI policies as a matter of first impression.

We find that STOLI policies run afoul of New Jersey's insurable interest requirement and are against public policy. It would elevate form over substance to conclude that feigned compliance with the insurable interest statute -- as technically exists at the outset of a STOLI transaction -- satisfies the law. Such an approach would upend the very protections the statute was designed to confer and would effectively allow strangers to wager on human lives.

3

In response to the certified questions, we find that STOLI policies are against public policy and are void ab initio, that is, from the beginning. We also note that a party may be entitled to a refund of premium payments depending on the circumstances. Among other relevant factors, courts should consider a later purchaser's participation in and knowledge of the original illicit scheme.

## I.

We draw the following facts from the opinions of the Third Circuit and the United States District Court for the District of New Jersey.

## A.

In April 2007, Sun Life Assurance Company of Canada received an application for a $5 million insurance policy on the life of Nancy Bergman. The application listed the Nancy Bergman Irrevocable Trust dated 4/6/2007 as the sole owner and beneficiary of the policy. Nancy Bergman signed the application as the grantor of the trust, and her grandson, Nachman Bergman, signed as trustee. The trust had four additional members. All of them were investors, and all were strangers to Ms. Bergman. The investors deposited money into the trust account to pay most if not all of the policy's premiums. The original trust agreement provided that any proceeds of the policy would be paid to Nachman Bergman.

4

Ms. Bergman was a retired middle school teacher.  Sun Life received an inspection report that listed her annual income as more than $600,000 and her overall net worth at $9.235 million.  In reality, her income was about $3000 a month from Social Security and a pension, and her estate was later valued at between $100,000 and $250,000.

Although Ms. Bergman represented that she had no other life insurance policies, five policies were taken out on her life in 2007 from various insurance companies, including Sun Life, for a total of $37 million.

Sun Life issued the $5 million policy in question on July 13, 2007.  At the time, the trust was the sole owner and beneficiary.  The policy had an incontestability clause that barred Sun Life from challenging the policy -- other than for non-payment of premiums -- after it had been "in force during the lifetime of the Insured" for two years.

On August 21, 2007, about five weeks after the policy was issued, Nachman Bergman resigned as trustee and appointed the four investors as successor co-trustees.  The trust agreement was amended so that most of the policy's benefits would go to the investors; they were also empowered to sell the policy on their own.

More than two years later, in December 2009, the trust sold the policy to SLG Life Settlements, LLC, for $700,000.  The investors received nearly all of

the proceeds from the sale. Afterward, a company named LTAP acquired the policy for a brief period, and Wells Fargo Bank, N.A. obtained it in a bankruptcy settlement in or about 2011. Wells Fargo continued to pay the premiums. It claims to have paid $1,928,726 through a combination of direct premium payments and loans to LTAP to pay premiums.

## B.

After Nancy Bergman passed away in 2014 at age 89, Wells Fargo sought to collect the policy's death benefit. Sun Life investigated the claim, uncovered the discrepancies noted above, and declined to pay. Instead, Sun Life filed an action in the District Court and sought a declaratory judgment that the policy was void ab initio as part of a STOLI scheme. Wells Fargo counterclaimed for breach of contract and sought the policy's $5 million face value; if the court voided the policy, Wells Fargo sought a refund of the premiums it paid and funded.

The District Court partially granted Sun Life's motion for summary judgment. The court found that New Jersey law applied and concluded "that this was a STOLI transaction lacking insurable interest in violation of [the State's] public policy. . . . As such, it should be declared void ab initio." The court also granted Wells Fargo's motion to recover its premium payments. The court reasoned that "Wells Fargo is not to blame for the fraud here" and

6

that "[a]llowing Sun Life to retain the premiums would be a windfall to the company."

Wells Fargo appealed the determination that the policy was void, and Sun Life cross-appealed the order to refund the premiums.

The Third Circuit noted that "[n]o New Jersey state court has considered" the issues at the heart of this case: "whether STOLI arrangements violate the public policy of New Jersey, and if they do, whether the affected insurance policies are rendered void ab initio." The circuit court also observed that "[i]f the Policy is declared void ab initio, then the nature of the remedy available to the parties is another unresolved question of New Jersey law."

To resolve those "difficult question[s] of New Jersey public policy" and law, the Third Circuit certified two questions of law to this Court:

> (1)  Does a life insurance policy that is procured with the intent to benefit persons without an insurable interest in the life of the insured violate the public policy of New Jersey, and if so, is that policy void ab initio?
>
> (2)  If such a policy is void ab initio, is a later purchaser of the policy, who was not involved in the illegal conduct, entitled to a refund of any premium payments that they made on the policy?

We accepted both questions pursuant to Rule 2:12A-5.  236 N.J. 581 (2018).  We also granted leave to appear as amici curiae to the Department of

Banking and Insurance (DOBI), the Institutional Longevity Markets Association (ILMA), and the Life Insurance Settlement Association (LISA).

## II.

To provide context for the discussion that follows, we review at the outset certain relevant statutes and concepts.

## A.

Life insurance is "[a]n agreement between an insurance company and the policyholder to pay a specified amount to a designated beneficiary on the insured's death." Black's Law Dictionary 1010 (9th ed. 2009); see also N.J.S.A. 17B:17-3. The Life and Health Insurance Code, at Title 17B of the New Jersey Statutes, regulates this area of law today.[1]

Life insurance has been around for more than 500 years. From its earliest days, there have been concerns about who can purchase a policy on the life of another. See Geoffrey Clark, Betting on Lives: The Culture of Life Insurance in England, 1695-1775 13-14 (1999). In 1419, for example, the Venetian Senate outlawed wagers on the Pope's life and nullified many speculative bets about "how long the reigning pope would live." Id. at 14. Elsewhere in Europe in the fifteenth through seventeenth centuries, "[t]he

---

[1] States have the authority to regulate insurance under the McCarran-Ferguson Act. 15 U.S.C. § 1012; see also Johnson & Johnson v. Dir., Div. of Taxation, 30 N.J. Tax 479, 494 (2018).

frequent association of life insurance with gambling and other disreputable

practices prompted governments to prohibit its practice without exception."

Id. at 14-15.

In England, life insurance "was legally unrestricted [until] well into the

eighteenth century." Id. at 17. By then, it had "bec[o]me so much a mode of

gambling (for people took the liberty of insuring any one's life, without

hesitation, whether connected with him, or not, . . . ) that it at last became a

subject of Parliamentary discussion." Id. at 22 (quoting James Allan Park, A

System of the Law of Marine Insurances 490 (1787)). From those discussions,

"the first appreciable regulation of life insurance" emerged, along with the

concept that the policyholder must have "a financial interest (a so-called

'insurable interest') in [the] life or event" to be insured. Ibid. Section One of

the Life Assurance Act of 1774 provided that

> no insurance shall be made by any person or persons,
> bodies politick or corporate, on the life or lives of any
> person, or persons, or on any other event or events
> whatsoever, wherein the person or persons for whose
> use, benefit, or on whose account such policy or
> policies shall be made, shall have no interest, or by way
> of gaming or wagering.

> [14 Geo. 3 (1774 c. 48), https://www.legislation.
> gov.uk/apgb/Geo3/14/48?view=plain.]

A contract without an insurable interest would be "null and void." Ibid. "The

goal of the 1774 Act . . . was to allow people to get the benefits of life

9

insurance while eliminating the betting on human life it encouraged."  Susan Lorde Martin, <u>Life Settlements:  The Death Wish Industry</u>, 64 <u>Syracuse L. Rev.</u> 91, 94-95 (2014).

The same limitation -- the insurable interest requirement -- was adopted in the United States as well.  <u>See</u> Peter Nash Swisher, <u>The Insurable Interest Requirement for Life Insurance:  A Critical Reassessment</u>, 53 <u>Drake L. Rev.</u> 477, 482-83 (2005).  By the nineteenth century, even in states where insurable interest statutes had not yet been enacted, "in most cases either the English statutes [were] considered as operative, or the older common law [was] followed."  <u>Conn. Mut. Life Ins. Co. v. Schaefer</u>, 94 U.S. 457, 460 (1877).  As a result, the Supreme Court explained, "[a] man cannot take out insurance on the life of a total stranger, nor on that of one who is not so connected with him as to make the continuance of the life a matter of some real interest to him."  <u>Ibid.</u>

The existence of an insurable interest distinguished valid life insurance policies from "mere wager policies."  <u>Ibid.</u>  The Court later addressed the complexity and importance of the requirement in <u>Warnock v. Davis</u>, 104 U.S. 775, 779 (1882).  As the Court explained,

> [i]t is not easy to define with precision what will in all cases constitute an insurable interest, <u>so as to take the contract out of the class of wager policies</u>. . . .  But in all cases there must be a reasonable ground, founded

10

upon the relations of the parties to each other, either
pecuniary or of blood or affinity, to expect some benefit
or advantage from the continuance of the life of the
assured.  <u>Otherwise the contract is a mere wager, by
which the party taking the policy is directly interested
in the early death of the assured.  Such policies have a
tendency to create a desire for the event.  They are,
therefore, independently of any statute on the subject,
condemned, as being against public policy.</u>

[<u>Ibid.</u> (emphases added).]

In New Jersey, the Legislature adopted the current insurable interest

requirement in 1968.  <u>L.</u> 1968, <u>c.</u> 318, § 1.  More than a century earlier, the

pre-1948 New Jersey Supreme Court[2] opined that a policy would be valid

without such an interest, <u>Trenton Mut. Life & Fire Ins. Co. v. Johnson</u>, 24

N.J.L. 576, 584 (Sup. Ct. 1854), even though it found the policyholder did

have an insurable interest in the life of the insured, <u>id.</u> at 582, 586-87.

Because New Jersey did not have a statute similar to England's Life Assurance

Act of 1774, the court based its decision on its view of the common law.  The

court found no insurable interest requirement under the common law.  <u>Id.</u> at

583-84.  The United States Supreme Court, however, reached a different

---

[2]  Prior to the 1948 Constitution, the New Jersey Supreme Court was an
intermediate appellate court; its rulings were subject to review by the Court of
Errors and Appeals, the State's highest court at the time.  Carla Vivian Bello &
Arthur T. Vanderbilt II, <u>New Jersey's Judicial Revolution:  A Political Miracle</u>
32 (1997); William M. Clevenger, <u>The Courts of New Jersey:  Their Origin,
Composition and Jurisdiction</u> 29-32 (1903).

11

conclusion in 1877.  See Schaefer, 94 U.S. at 460 (noting that "the law of

England prior to the Revolution of 1688" was that policies without an

insurable interest were "void, as against public policy").

The current statutory scheme appears at N.J.S.A. 17B:24-1.1.  The

Legislature expressly imposed an insurable interest requirement and thus

superseded dated case law like Johnson.  See United States v. Texas, 507 U.S.

529, 534 (1993) (noting that a statute can "abrogate a common-law principle"

if it "'speak[s] directly' to the question addressed by the common law"

(quoting Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625 (1978))); see

also Fu v. Fu, 160 N.J. 108, 121 (1999).

N.J.S.A. 17B:24-1.1(a) outlines three situations in which an individual

has an insurable interest:

> (1)  An individual has an insurable interest in his own
> life, health and bodily safety.
>
> (2)  An individual has an insurable interest in the life,
> health and bodily safety of another individual if he has
> an expectation of pecuniary advantage through the
> continued life, health and bodily safety of that
> individual and consequent loss by reason of his death
> or disability.
>
> (3)  An individual has an insurable interest in the life,
> health and bodily safety of another individual to whom
> he is closely related by blood or by law and in whom he
> has a substantial interest engendered by love and
> affection.  An individual liable for the support of a child

12

> or former wife or husband may procure a policy of
> insurance on that child or former wife or husband.

The statute also specifies circumstances under which a corporation, N.J.S.A.

17B:24-1.1(a)(4), or a nonprofit or charitable entity, id. § (a)(5), has an

insurable interest in the lives of its employees, officers, or others.

Critical to the questions presented in this case, section (b) of N.J.S.A.

17B:24-1.1 bars procurement of a life insurance policy payable to someone

who lacks an insurable interest in the life of the insured:

> No person shall procure or cause to be procured any
> insurance contract upon the life, health or bodily safety
> of another individual unless the benefits under that
> contract are payable to the individual insured or his
> personal representative, or to a person having, at the
> time when that contract was made, an insurable interest
> in the individual insured.

Sections (c) and (d) of N.J.S.A. 17B:24-1.1 address violations of the

insurable interest statute from different perspectives. Specifically, N.J.S.A.

17B:24-1.1(c) allows "the individual insured, or his executor or administrator"

to "maintain an action to recover" any benefits paid "under any contract made

in violation of" the insurable interest requirement. And N.J.S.A. 17B:24-

1.1(d) protects an insurer's good faith reliance "upon all statements,

declarations and representations made by an applicant for insurance relating to

the insurable interest of the applicant." No published opinions by this Court or

the Appellate Division interpret New Jersey's insurable interest statute.

13

B.

Just as all New Jersey insurance policies must be based on an insurable interest, they must also contain an incontestability clause.  See N.J.S.A. 17B:25-4 ("There shall be a provision that the policy . . . shall be incontestable, except for nonpayment of premiums, after it has been in force during the lifetime of the insured for a period of 2 years from its date of issue.").  Forty-three states require incontestability clauses in life insurance policies, and they are "found in almost all policies."  2 Harnett & Lesnick, The Law of Life and Health Insurance § 5.07 (Matthew Bender, rev. ed. 2018). New Jersey was in line with standard industry practice when it adopted a two-year period after which policies cannot be contested except for nonpayment of premiums.  See id. § 5.07(2); see also N.J.S.A. 17B:25-4.

Like statutes of limitations, incontestability clauses create incentives for insurers to challenge questionable policies in a timely manner, rather than continue to collect premiums and complain "only when called upon to pay." See Harrison v. Provident Relief Ass'n of Wash., D.C., 126 S.E. 696, 701 (Va. 1925); see also 17 Couch on Insurance § 240:5 (3d ed. 2018).

Incontestability clauses, however, are not a bar to all defenses.  See 2 Harnett & Lesnick § 5.07(5) (cataloguing common defenses and decisions on both sides of the incontestability issue).  For example, "it has generally been

14

held that an insurance policy violative of public policy or good morals cannot be enforced simply because the incontestability period has run." Tulipano v. U.S. Life Ins. Co., 57 N.J. Super. 269, 277 (App. Div. 1959) (collecting cases); see also Martin, Life Settlements, 64 Syracuse L. Rev. at 104 ("[T]he Delaware Supreme Court, and a majority of other courts that have decided cases on the inviolability of incontestability clauses, held that the incontestability period is contingent on the existence of a valid contract." (footnote omitted)).

A majority of courts have held that the lack of an insurable interest can be asserted as a defense even after a policy has become incontestable. See, e.g., PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr., 28 A.3d 1059, 1067-68 (Del. 2011); Beard v. Am. Agency Life Ins. Co., 550 A.2d 677, 691 (Md. 1988); see also 17 Couch on Insurance § 240:82 ("The majority of jurisdictions follow the view that an incontestable clause does not prohibit insurers from resisting payment on the ground that the policy was issued to one having no insurable interest -- such a defense may be raised despite the fact that the period of contestability has expired."); 8 New Appleman on Insurance Law Library Edition § 83.09 (2018) ("Nearly every jurisdiction that has addressed the issue holds that a policy lacking an insurable interest is void

and is not rendered valid by an incontestability provision.").  As the Delaware

Supreme Court has explained,

> if a life insurance policy lacks an insurable interest at
> inception, it is void ab initio because it violates
> Delaware's clear public policy against wagering.  It
> follows, therefore, that if no insurance policy ever
> legally came into effect, then neither did any of its
> provisions, including the statutorily required
> incontestability clause. . . .  As a result, the
> incontestability provision does not bar an insurer from
> asserting a claim on the basis of a lack of insurable
> interest.

> [Price Dawe, 28 A.3d at 1067-68 (footnotes omitted).]

## C.

Although life insurance policies must be payable to a person with an

insurable interest when they are procured, policies can be sold later on --

including to individuals who would not have been able to buy the policy

originally because they lacked an insurable interest.  As Justice Oliver Wendell

Holmes, Jr., wrote in Grigsby v. Russell, 222 U.S. 149, 156 (1911), "[s]o far as

reasonable safety permits, it is desirable to give to life policies the ordinary

characteristics of property. . . .  To deny the right to sell except to persons

having [an insurable] interest is to diminish appreciably the value of the

contract in the owner's hands."

In New Jersey, life insurance policies may be sold subject to the

regulatory scheme outlined in the Viatical Settlements Act, N.J.S.A. 17B:30B-

1 to -17.  In general, a viatical settlement is "[a] transaction in which a

terminally or chronically ill person sells the benefits of a life-insurance policy

to a third party" at a discounted value "in return for a lump-sum cash

payment."  Black's Law Dictionary 1497 (9th ed. 2009).  The seller or insured

is called the "viator."  Ibid.

"The viatical settlements industry was born in the 1980s in response to

the AIDS crisis."  Life Partners, Inc. v. Morrison, 484 F.3d 284, 287 (4th Cir.

2007).  Particularly in the early days of the crisis, when "victims usually died

within months of diagnosis," many AIDS sufferers needed money for

treatment.  Ibid.  Because of their short life expectancies, "investors were

willing to purchase . . . life insurance policies."  Ibid.  The market for viatical

settlements later expanded to include policies for the elderly and people with

diseases other than AIDS.  Id. at 287-88.

The imbalance in power between people in desperate need of funds and

more sophisticated investors willing to buy life insurance policies led to the

regulation of viatical settlements.  See id. at 288.  The New Jersey Legislature

passed a viatical settlements law in 1999, L. 1999, c. 211, "to protect

particularly vulnerable persons from aggressive or fraudulent business tactics,"

Governor's Statement on Signing S. 1515 (Sept. 17, 1999).  The Legislature

repealed the law in 2005 and replaced it with "a broader regulatory scheme" --

17

the Viatical Settlements Act, L. 2005, c. 229.  See Sponsor's Statement to S.

1940 37 (Oct. 4, 2004).

The Act defines a "viatical settlement contract" as

> a written agreement establishing the terms under which
> compensation or anything of value will be paid, which
> compensation or value is less than the expected death
> benefit of the policy, in return for the viator's
> assignment, transfer, sale, devise or bequest of the
> death benefit or ownership of any portion of the
> policy. . . .  A viatical settlement contract includes an
> agreement with a viator to transfer ownership or change
> the beneficiary designation at a later date regardless of
> the date that compensation is paid to the viator.
>
> [N.J.S.A. 17B:30B-2.]

The definition also includes financing agreements but expressly excludes

"written agreement[s] between a viator and a person having an insurable

interest in the insured's life."  Ibid.

A key provision of the Act limits the potential for abuse.  Aside from

limited exceptions, the law bars policyholders from entering into a viatical

settlement contract -- and thus transferring the policy benefit to a stranger --

for two years from the date the policy was issued.  N.J.S.A. 17B:30B-10(a).

The statute reads as follows:

> a. It is a violation of this act for any person to enter
> into a viatical settlement contract within a two-year
> period commencing with the date of issuance of the
> insurance policy unless the viator certifies [that] . . . :

(1) The policy was issued upon the viator's exercise of conversion rights arising out of a group or individual life insurance policy. . . ;

(2) The viator submits independent evidence to the viatical settlement provider that within the two-year period:  (a) the viator or insured was terminally ill or chronically ill; or (b) the viator or insured disposed of his ownership interests in a closely held corporation [subject to certain limitations]; or (c) both.

[Ibid.]

Thus, under section 10(a), a policyholder may not "assign[], transfer, s[ell], devise or beque[ath] . . . the death benefit or ownership of any portion of the policy" to someone without an insurable interest in the life of the insured, N.J.S.A. 17B:30B-2, for a period of two years, unless the policyholder exercised conversion rights, id. § 10(a)(1), or the policyholder or insured was terminally or chronically ill, disposed of ownership interests in a closely held corporation, or both, id. § 10(a)(2).

Over time, and as the market expanded, "the industry changed its name and description from 'viatical settlements' to 'life settlements.'"  Susan Lorde Martin, Betting on the Lives of Strangers:  Life Settlements, STOLI, and Securitization, 13 U. Pa. J. Bus. L. 173, 185-87 (2010).  STOLI policies -- once again, short for stranger-originated life insurance policies -- are a subset of life settlements.

In a traditional life settlement, "investors purchase existing life insurance policies from insureds who no longer need the insurance to protect their families in the event of their deaths." Id. at 187.  In a STOLI arrangement, by contrast, "a life settlement broker persuades a senior citizen . . . to take out a life insurance policy" -- not to protect the person's family but for a cash payment or some other current benefit arranged with a life settlement company.  Ibid.  A key "difference between non-STOLI and STOLI policies," as the Second Circuit has explained, "is simply one of timing and certainty; whereas a non-STOLI policy might someday be resold to an investor, a STOLI policy is intended for resale" before it is issued.  United States v. Binday, 804 F.3d 558, 565 (2d Cir. 2015).

Generally, an investor funds a STOLI policy from the outset, which makes it possible to obtain a policy with a high face value.  See Martin, Betting on the Lives of Strangers, 13 U. Pa. J. Bus. L. at 188.  The investor may lend the insured "the money to pay the premiums for" the period of incontestability, typically two years.  Ibid.  It is also common for an insured to buy the policy in the name of a trust and name a "spouse or other loved one as the trust beneficiary."  Ibid.  In such arrangements,

> [i]f the insured dies within [the contestability] period, his spouse, as beneficiary of the insurance trust, will get the death benefit (the free insurance), pay back the loan plus interest from the proceeds, and often pay the

20

broker up to fifty percent of the benefit received.  If the insured lives beyond two years or the contestability period, then the life settlement company buys the beneficial interest in the insurance trust, paying the insured a lump sum percent of the face value of the policy . . . .  The life settlement company or its investors will continue to pay the premiums on the policy, and when the insured dies, they will get the death benefit. Clearly, the sooner the insured dies, the greater the company's profit.

[Ibid. (footnotes omitted).]

STOLI arrangements thus present a significant legal problem:  the investors have "no insurable interest in the life of the insured." Ibid.  As a result, the transactions pose questions in light of New Jersey's policy against wagering.  See Binday, 804 F.3d at 565 ("A STOLI policy is one obtained by the insured for the purpose of resale to an investor with no insurable interest in the life of the insured -- essentially, it is a bet on a stranger's life."); see also Grigsby, 222 U.S. at 156 (noting that "cases in which a person having an interest lends himself to one without any as a cloak to what is in its inception a wager have no similarity to those where an honest contract is sold in good faith").

## D.

New Jersey's anti-wagering policy is anchored in Article 4, Section 7, Paragraph 2 of the State Constitution, which bars the Legislature from authorizing gambling on its own aside from specific exceptions.  Under

subsections (A) through (F), the Legislature can authorize particular games of chance run by charitable, religious, and certain other groups; state lotteries; gambling in Atlantic City; and other specified kinds of wagering.  See N.J. Const. art. IV, § 7, ¶ 2.  Voter approval is required for gambling of any other kind, see ibid., including wagers on a stranger's life.

The Legislature, in turn, directly barred gambling.  See N.J.S.A. 2A:40-1 (declaring gaming transactions unlawful); N.J.S.A. 2A:40-3 (declaring void all agreements that violate N.J.S.A. 2A:40-1).

The above provisions are relevant expressions of public policy that inform our analysis of the statutes at the center of this appeal.  Moreover, the insurable interest requirement is consistent with and helps enforce the Constitution's prohibition on gambling.  By ensuring full compliance with the insurable interest statute, we can avoid an outcome that might run afoul of the Constitution.

## III.

Sun Life relies heavily on New Jersey's anti-wagering provisions and argues that the policy in question is nothing more than a wager because it lacked an insurable interest.  As a result, Sun Life contends, the policy never took effect and may now be challenged because the incontestability clause likewise never took effect.

Wells Fargo counters that allowing the sale of life insurance policies is also a matter of public policy -- one that the Legislature has regulated through the insurable interest statute and the Viatical Settlements Act. Wells Fargo asserts that the policy in this case fully complied with the insurable interest requirement at the policy's inception, and that, even if it did violate the Viatical Settlements Act, it could be challenged on that basis only for a period of two years.

We consider those arguments in the context of the Third Circuit's first question.

## A.

The first part of question one asks whether "a life insurance policy that is procured with the intent to benefit persons without an insurable interest in the life of the insured violate[s] the public policy of New Jersey."

If a third party without an insurable interest procures or causes an insurance policy to be procured in a way that feigns compliance with the insurable interest requirement, the policy is a cover for a wager on the life of another and violates New Jersey's public policy. In such a case, the plain

language reading of the statute that Wells Fargo advances can lead to absurd results.[3]

1.

Consider a policy that strangers financed or caused to be procured for Mary's life. When the policy is issued, Mary's daughter is the named beneficiary or the trustee of an irrevocable trust that owns the policy. The trust thus has an insurable interest at the time the contract for the policy is made. See N.J.S.A. 17B:24-1.1(a). But the strangers actually have a side agreement with Mary or her daughter to transfer control of the trust, the beneficial interest in the policy, or ownership of the policy, at a later time. In short, the outside investors who funded the policy effectively control it from the start.

If the investors cause the daughter to transfer her interest to them a month, a day, or an hour after the policy is issued, it would elevate form over substance to suggest that the policy satisfies the insurable interest requirement. At most, there is only feigned compliance with the requirement that an

---

[3] Statutes cannot "be construed to lead to absurd results. All rules of construction are subordinate to that obvious proposition." State v. Provenzano, 34 N.J. 318, 322 (1961). "[W]hen 'a literal interpretation would create a manifestly absurd result, contrary to public policy,' courts may consider the law's overall purpose for direction." Sussex Commons Assocs., LLC v. Rutgers, 210 N.J. 531, 541 (2012) (quoting Hubbard ex rel. Hubbard v. Reed, 168 N.J. 387, 392 (2001)).

24

insurable interest exist "at the time when [the] contract was made." See

N.J.S.A. 17B:24-1.1(b).  In reality, Mary and her daughter satisfy the

requirement in name alone.  The policy is a cover for a wager on Mary's life

by a stranger.  It therefore violates public policy.

STOLIs commonly involve life insurance policies procured and financed

by investors -- strangers -- who have no insurable interest in the life of the

insured yet, from the outset, are the ultimate intended beneficiaries of the

policy.  In other words, in a classic STOLI situation, a stranger who hopes the

insured will die soon causes the policy to be procured and collects the death

benefit.  That type of arrangement runs afoul of New Jersey's insurable

interest requirement and the statute's purpose.  It also counters the principle

underlying the requirement:  the individual with an insurable interest "must

have an interest in the continued life of the insured rather than in his early

death." Ohio Nat'l Life Assurance Corp. v. Davis, 803 F.3d 904, 907 (7th Cir.

2015); see also Warnock, 104 U.S. at 779 (noting that because of "the relations

of the parties," someone with an insurable interest "expect[s] some benefit or

advantage from the continuance of the life of the assured" (emphasis added)).

Contrary to Wells Fargo's assertions, sections (c) and (d) of the

insurable interest statute do not call for a different result.  N.J.S.A. 17B:24-

1.1(c) addresses the recovery of moneys already paid under a contract that

violates the insurable interest requirement.  It creates a cause of action for the insured or her estate <u>after</u> a death benefit has been paid.  Section (d) insulates insurers from liability when they rely on an applicant's statements about her insurable interest.  Neither section allows for enforcement of a policy that lacks an insurable interest.  Nor do the sections contain language that suggests they are the exclusive remedies when the absence of an insurable interest arises after two years.

Sections (a)(4) and (a)(5) of N.J.S.A. 17B:24-1.1 also inform the meaning and scope of the insurable interest requirement.  Section (a)(4) expressly allows corporations to insure their directors, officers, employees, and others.  Section (a)(5) similarly enables nonprofit or charitable entities to insure their directors and others, including their supporters.  Under (a)(5), a director, supporter, or other insured must either sign the application for insurance, which names the charitable entity as the owner and beneficiary, or "subsequently transfer ownership of the insurance to the entity."

Those detailed sections were added to the insurable interest statute in 1991.  <u>L.</u> 1991, <u>c.</u> 369.  The Sponsor's Statement noted that "the principle of insurable interest was founded on the idea that the person purchasing the policy should have such a real and substantial interest in the property or person insured as would prevent the policy from being a mere wager on the insured

26

event." Sponsor's Statement to A. 4957 2 (L. 1991, c. 369). The statement added, however, that "[o]ver the years, many states have expanded the concept of insurable interest for the purpose of life and health insurance to reflect current trends in investment and the development of innovative insurance products," and that the time had come to broaden New Jersey's definition of insurable interest in part "to afford New Jersey residents greater access to the myriad policy and investment options already available in other states." Id. at 2-3.

Notably, despite the pro-investment aim of the 1991 amendments, the Legislature did not modify or loosen the insurable interest requirement beyond the particular areas that sections (a)(4) and (a)(5) address. Both sections reveal that when the Legislature meant to expand the insurable interest requirement to allow transfers that would satisfy the requirement, the Legislature acted with precision and care.

Finally, we note that an incontestability provision does not bar a challenge to a STOLI policy. As discussed earlier, insurance contracts that are contrary to public policy cannot be enforced despite an incontestability clause. See Tulipano, 57 N.J. Super. at 277 (collecting cases); see also Martin, Life Settlements, 64 Syracuse L. Rev. at 104. If a policy never came into effect, neither did its incontestability clause; the clause thus cannot stand in the way

27

of a claim that the policy violated public policy because it lacked an insurable interest.  See Price Dawe, 28 A.3d at 1067-68; 17 Couch on Insurance § 240:82; 8 New Appleman on Insurance Law § 83.09.

2.

In the prior example, strangers funded the policy at the outset.  Other situations might also raise concerns.  Imagine, for example, that Mary's daughter procured the above policy, paid the policy premiums for a few months, and then transferred her role as trustee, or the ownership or beneficial interest in the policy, to a group of strangers in exchange for full reimbursement and some compensation.  Suppose as well that Mary's daughter intended to do so from the start.  That arrangement likewise might be little more than a cover for a wager on Mary's life for the benefit of strangers, and it raises questions about the manner in which the policy was procured.  The transfer could also result in a challenge under the Viatical Settlements Act, N.J.S.A. 17B:30B-13.

A number of considerations could affect the validity of the policy:  the nature and timing of any discussions between the purchaser and the strangers; the reasons for the transfer; and the amount of time the policy was held; among other factors.

28

If the purchaser and investors discussed an arrangement in advance, a third party without an insurable interest may have caused the policy to be procured -- even if no firm agreement had yet been finalized. See N.J.S.A. 17B:24-1.1(b) (stating that "[n]o person shall procure or cause to be procured" a policy without an insurable interest) (emphasis added)).

Wells Fargo and LISA both stress that the Legislature could have -- but did not -- impose a good faith intent requirement on the purchase of life insurance policies. Nonetheless, if a person with an insurable interest takes out a policy because he has an agreement to sell it to a third party, the transaction could be as much of an attempt to circumvent the insurable interest requirement as if a stranger had funded the policy at the outset. In either event, the aim of the insurable interest requirement would be thwarted.[4]

Timing may also be a relevant factor. By way of comparison, the Viatical Settlements Act restricts for two years the sale of lawfully purchased policies to people who lack an insurable interest. N.J.S.A. 17B:30B-10(a). The Act addresses a different set of circumstances -- typically, the sale of a life insurance policy at a discount, by an elderly or ill person -- and the Legislature

---

[4] But see PHL Variable Insurance Co. v. Bank of Utah, 780 F.3d 863, 865-66, 868 (8th Cir. 2015) (upholding a policy purchased by a 74-year-old retiree, with guidance from an insurance agent, for the purpose of selling it on the secondary market, and noting that the insured held the policy for two years before he surrendered it to repay a loan).

imposed limits to guard against the abuse of vulnerable individuals.  Likewise, in the related context of this matter, the less time the policy owner held the policy before transferring it to a stranger, the greater the likelihood the policy violates public policy.

Courts cannot devise a bright-line rule for the type of transaction this second hypothetical presents.  The area is best addressed by the Legislature and DOBI.

### B.

Thirty states have enacted anti-STOLI legislation to date.  <u>See</u> Ariz. Rev. Stat. Ann. § 20-443.02(A); Ark. Code Ann. §§ 23-81-802(7)(A)(i)(j), 23-81-816; Cal. Ins. Code §§ 10113.1(g)(B), 10113.3(s); Colo. Rev. Stat. § 10-7-708(2); Conn. Gen. Stat. § 38a-465j(a)(1), (a)(2)(A)(i)(X); Fla. Stat. §§ 626.99289, 626.99291; Ga. Code Ann. §§ 33-59-2(6)(A)(i)(X), 33-59-14(a)(1); Haw. Rev. Stat. § 431C-42(1)(A)(x); Idaho Code § 41-1962(1); 215 Ill. Comp. Stat. 159/50(a); Ind. Code § 27-8-19.8-20.1; Iowa Code §§ 508E.2(6)(a)(3), 508E.15(1)(a); Kan. Stat. Ann. §§ 40-5002(f)(5), 40-5012a(a)(1); Ky. Rev. Stat. Ann. §§ 304.15-020(7)(a)(1)(k), 304.15-717(1)(d); Me. Stat. tit. 24-A, §§ 6802-A(6)(A)(3), 6818(1)(A); Mass. Gen. Laws ch. 175, § 223A(a), (b)(1)(i)(J); Minn. Stat. § 60A.0784(2); N.H. Rev. Stat. Ann. § 408-D:12(I); N.Y. Ins. Law § 7815(c) (McKinney); N.D. Cent. Code §§

30

26.1-33.4-01(7)(a)(1)(j), 26.1-33.4-13(1)(a); Ohio Rev. Code Ann. § 3916.172;

Okla. Stat. tit. 36, §§ 4055.2(7)(e), 4055.13(A)(1); Or. Rev. Stat.

§ 744.369(10); 27 R.I. Gen. Laws §§ 27-72-2(9)(i)(A)(X), 27-72-14(a)(1);

Tenn. Code Ann. §§ 56-50-102(6)(A)(iii), 56-50-114(a)(1); Utah Code Ann.

§ 31A-36-113(2)(a)(iii); Vt. Stat. Ann. tit. 8, § 3844(a)(2); Wash. Rev. Code

§§ 48.102.006(8)(a)(ii), 48.102.140(1)(a); W. Va. Code §§ 33-13C-2(5)(F),

33-13C-14(a)(1); Wis. Stat. § 632.69(1)(g)(7), (15)(a);  see also Neb. Rev.

Stat. § 44-1110(1)(c).

     Two model acts have been designed to stop STOLIs.  One bars any

person from "[e]nter[ing] into any practice or plan which involves STOLI[s]."

National Conference of Insurance Legislators (NCOIL), Life Settlements

Model Act §§ 2(H)(1)(a)(x), 13(A)(3), (readopted in March 2014), http://ncoil.

org/wp-content/uploads/2016/04/AdoptedLifeSettlementsModel.pdf.  The

other generally bars viatical settlement agreements for five years, instead of

two.  See National Association of Insurance Commissioners (NAIC), Viatical

Settlements Model Act § 11 (July 2009), https://www.naic.org/store/free/

MDL-697.pdf.

     Anti-STOLI legislation has been proposed multiple times in New Jersey.

From 2009 through 2014, ten bills were introduced:  S. 2747 (Apr. 27, 2009);

A. 3991 (June 4, 2009); A. 4196 (Nov. 23, 2009); S. 487 (Jan. 12, 2010); A.

371 (Jan. 12, 2010); A. 376 (Jan. 12, 2010); A. 234 (Jan. 10, 2012); A. 237 (Jan. 10, 2012); A. 1049 (Jan. 16, 2014); A. 1051 (Jan. 16, 2014).  None were passed or enacted.

Despite suggestions by Wells Fargo, it is difficult to discern the Legislature's intent from bills it has not passed.  See Grupe Dev. Co. v. Superior Court, 844 P.2d 545, 552 (Cal. 1993) (en banc); Entergy Gulf States, Inc. v. Summers, 282 S.W.3d 433, 443 (Tex. 2009).  Some legislators may have thought that current law already barred STOLI policies under the insurable interest statute and that the proposed laws were unnecessary; others may have opposed the bills.  Under the circumstances, we are unable to determine what the Legislature meant when it did not act on proposed legislation.

## C.

The position of the Division of Banking and Insurance also offers a view of the State's present public policy toward STOLI policies.  DOBI's amicus brief outlines the nature of a "STOLI scheme" and submits that "it is against the public policy of New Jersey for a third party to procure a life insurance policy from a life insurance company with the intent to benefit persons without an insurable interest in the insured."  "A policy procured under such circumstances," DOBI explains, "violates the insurable interest requirement of

32

N.J.S.A. 17B:24-1.1." Absent an insurable interest, according to DOBI, a life insurance policy is a "pure gamble" in violation of N.J.S.A. 17B:24-1.1 and "the anti-gambling provisions of both the New Jersey Constitution and New Jersey statutes."

DOBI's views are entitled to considerable weight in this area, which falls within its field of expertise. See In re Election Law Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 262 (2010); see also N.J.S.A. 17:1-1 (charging DOBI "with the execution of all laws relative to insurance").

### D.

Other courts have considered similar questions under related state laws.

In Davis, the Seventh Circuit found STOLI policies void at the outset under Illinois law. 803 F.3d at 907-09.[5] The STOLI scheme in the case worked as follows: Defendant Davis persuaded people "to become the nominal . . . buyers of" life insurance policies in exchange for "small amounts of money." Id. at 906. Along with another defendant who was an insurance agent, Davis "targeted elderly people because of their diminished life

---

[5] The court based its decision on "the common law of Illinois" but noted that Illinois adopted anti-STOLI legislation after the relevant policies were issued. Id. at 909.

expectancies and African-Americans because the average life expectancy of an African-American is shorter than that of other Americans." <u>Ibid.</u>

Once a policy was issued, defendants had the insured place it in an irrevocable trust. <u>Ibid.</u> The trust was designated as the "policy's owner and beneficiary," and Davis, a lawyer, served as trustee. <u>Ibid.</u> At the start, trust documents also listed "either members of the insured's family or the insured's other trusts" as beneficiaries. <u>Id.</u> at 907. Weeks or months later, "Davis would have the nominal buyer of the policy . . . assign the beneficial interest in the trust (and therefore in the policy) to a company owned by [a third] defendant." <u>Ibid.</u> That person "would make the initial premium payments . . . but then resell the beneficial interest in the trust to an investor who hoped that the insured would die soon" -- to be able to collect the proceeds of the policy. <u>Ibid.</u>

Through those steps, "the defendants were trying to appear to comply with the" insurable interest requirement. <u>Ibid.</u> As the court observed, "one can't take out a life insurance policy on a person unless one has an interest, financial or otherwise, in the life of the insured rather than in his early death." <u>Id.</u> at 908 (citing <u>Grigsby</u>, 222 U.S. at 155). In the STOLI scheme in question, though, the circuit court found no such insurable interest:

> The insureds merely lent their names to the insurance
> applications, in exchange for modest compensation,

34

> and the defendants forthwith transferred control over
> (effectively ownership of) the policies to themselves.
> The defendants, who had no interest in the insureds'
> lives (as distinct from their deaths), initiated, paid for,
> and controlled the policies from the outset.
>
> . . . .
>
> . . . The insureds' family members . . . retained
> beneficial interests in the policies only briefly and
> never controlled the trusts. The insureds were the
> defendants' puppets and the policies were bets by
> strangers on the insureds' longevity.

[Id. at 908-09.]

In essence, the Seventh Circuit concluded that feigned compliance with the

insurable interest requirement is not enough.

The Supreme Court of Delaware reached a similar conclusion in Price

Dawe, 28 A.3d 1059. In that case, the Price Dawe 2006 Insurance Trust

purchased a $9 million life policy on Dawe's life. Id. at 1063. A family trust

was the named beneficiary, and "Dawe was the beneficiary of the family

trust." Ibid. PHL Variable Insurance Company (Phoenix) issued the policy.

Ibid. About two months later, an unrelated private investor "formally

purchased the beneficial interest of the Dawe Trust from the Family Trust."

Id. at 1064. When Dawe died some three years later, and two competing

claims were made, Phoenix discovered the circumstances of the sale and

sought a declaratory judgment in United States District Court that the policy was void.  Id. at 1063-64.

The Delaware Supreme Court accepted and answered three certified questions of law.  The court first found that Phoenix could challenge the policy for lack of an insurable interest despite an incontestability clause.  Id. at 1065.

The second question asked "whether the statutory insurable interest requirement is violated where the insured procures a life insurance policy with the intent to immediately transfer the benefit to an individual or entity lacking an insurable interest."  Id. at 1068.  The court found that it is not, "so long as the insured procured or effected the policy and the policy is not a mere cover for a wager."  Ibid.

The court based its decision on various provisions of Delaware's statutory code in light of the history and purpose of the insurable interest requirement.  Id. at 1071-76 (discussing Del. Code Ann. tit. 18, §§ 2704, 2705, 2708, and 2720).  The opinion thus focused principally on who "procured" the policy or "caused it to be procured," and not on the insured's subjective intent. Id. at 1075-76 (construing Del. Code Ann. tit. 18, § 2704(a)).  "To determine who procured the policy," the court "look[ed] at who pa[id] the premiums." Id. at 1075.

The court also addressed STOLI policies and noted they "lack an insurable interest and are thus an illegal wager on human life." Id. at 1070. Delaware's insurable interest statute at section 2704(a), the court explained, "requires more than just technical compliance at the time of issuance," yet "STOLI schemes are created to feign technical compliance with" the law. Id. at 1074. "At issue is whether a third party having no insurable interest can use the insured as a means to procure a life insurance policy that the statute would otherwise prohibit. Our answer is no," because of the insurable interest requirement. Ibid.

The court applied the same line of thinking to a third question, which concerned the use of trusts to effect the transfer of a policy. See id. at 1076-78. The court observed that, "[i]n cases where a third party either directly or indirectly funds the premium payments as part of a pre-negotiated arrangement with the insured to immediately transfer ownership, the policy fails at its inception for lack of an insurable interest." Id. at 1078.

The United States District Court for the Eastern District of Tennessee used similar reasoning to void a STOLI policy purchased through a trust and funded by outsiders. Sun Life Assurance Co. v. Conestoga Tr. Servs., LLC, 263 F. Supp. 3d 695, 697, 699 (E.D. Tenn. 2017). The policy had been issued before Tennessee's anti-STOLI legislation took effect. Id. at 701 n.3. The

District Court noted that "Tennessee courts have held for over one hundred years that life insurance taken out as a wager is void." Id. at 701.  The court also found that "Tennessee prohibit[ed] STOLI policies through both statutory and common law." Ibid.  The nominal use of a trust, the court explained, did not satisfy the state's insurable interest requirement. Id. at 702.  The facts instead revealed a scheme that improperly used a named insured "as a conduit to acquire a policy" that investors "could not otherwise acquire." Ibid.

Before the New York Legislature barred STOLI policies, the Court of Appeals of New York "h[e]ld that New York law permits a person to procure an insurance policy on his or her own life and immediately transfer it to one without an insurable interest in that life, even where the policy was obtained for just such a purpose." Kramer v. Phoenix Life Ins. Co., 940 N.E.2d 535, 536-37, 539 n.5 (N.Y. 2010); see also N.Y. Ins. Law § 7815(c) (McKinney).

Kramer involved a challenge to "several insurance policies obtained by [a] decedent . . . on his own life, allegedly with the intent of immediately assigning the beneficial interests to investors who lacked an insurable interest in his life." 940 N.E.2d at 537.  In considering a question certified by the Second Circuit, the Court of Appeals explained that a specific provision in New York law upheld the policies:

> Any person of lawful age may on his own initiative
> procure or effect a contract of insurance upon his own

38

person for the benefit of any person, firm, association
or corporation.  <u>Nothing herein shall be deemed to
prohibit the immediate transfer or assignment of a
contract so procured or effectuated</u>.

[<u>Id.</u> at 539 (emphasis added) (quoting N.Y. Ins. Law
§ 3205(b)(1) (McKinney)).]

New Jersey has no such statute.

Florida's insurable interest statute similarly states that an "insurable

interest need not exist after the inception date of coverage."  Fla. Stat.

§ 627.404(1).  Relying on that statute, the Florida Supreme Court declined to

find STOLI policies exempt from a two-year period of incontestability.  <u>Wells

Fargo Bank, N.A. v. Pruco Life Ins. Co.</u>, 200 So. 3d 1202, 1205-06 (Fla.

2016).  Florida later enacted anti-STOLI legislation.  Fla. Stat. §§ 626.99289,

626.99291.

California's insurable interest statute also limits the duration of an

insurable interest:  "[A]n interest in the life or health of a person insured must

exist when the insurance takes effect, but need not exist thereafter or when the

loss occurs."  <u>See</u> Cal. Ins. Code § 286.  The United States District Court for

the Central District of California relied on that provision in rejecting a

challenge to several life insurance policies in <u>Lincoln National Life Insurance

Co. v. Gordon R.A. Fishman Irrevocable Life Trust</u>, 638 F. Supp. 2d 1170,

1170-71, 1177, 1179 (C.D. Cal. 2009).  Similar to a STOLI transaction,

policies were purchased through a trust, which borrowed $2.8 million to cover premiums and fees for two years; almost immediately, the policies were assigned to the lender as security.  <u>Id.</u> at 1174-76.  The trust remained the owner of the policies.  <u>Id.</u> at 1179.

The court observed that the "[d]efendants may have found a loophole in the law barring a STOLI finding."  <u>Ibid.</u>  Although the financing scheme "skirts close to the letter, and certainly can be viewed as violating the spirit, of the law . . . the law as it presently exists allows this kind of insurance arrangement."  <u>Ibid.</u>  Like New York and Florida, California has now enacted anti-STOLI legislation.  <u>See</u> Cal. Ins. Code §§ 10113.1(g)(B), 10113.3(s).

New Jersey statutory law does not permit the immediate transfer of a life insurance policy to people or entities that lack an insurable interest.  As noted above, policyholders who lawfully procure life insurance policies cannot transfer them through a viatical settlement agreement for two years, aside from limited exceptions.  <u>See</u> N.J.S.A. 17B:30B-10(a).

Nor does New Jersey have an analogue to Wis. Stat. 631.07(4), which provides that "[n]o insurance policy is invalid merely because the policyholder lacks insurable interest."  The Seventh Circuit relied on the statute when it declined to declare a policy void under Wisconsin law.  <u>Sun Life Assurance Co. of Can. v. U.S. Bank Nat'l Ass'n</u>, 839 F.3d 654, 657-58 (7th Cir. 2016).

40

The circuit court noted that Wisconsin had "retain[ed] the common law principle forbidding the purchase of a life insurance policy by one who lacked an insurable interest" but had "changed the remedy from cancelling the policy to requiring the insurer to honor its promise," by paying someone equitably entitled to the benefit.  Id. at 656.

## IV.

To be clear, we do not suggest that life settlements in general are contrary to public policy.  Valid life insurance policies are assets that can be sold.  See Grigsby, 222 U.S. at 156.  An established secondary market exists for the sale of valid policies -- at least two years after they are issued or earlier in certain cases, see N.J.S.A. 17B:30B-10(a) -- to investors who lack an insurable interest, see generally Peter Nash Swisher, Wagering on the Lives of Strangers:  The Insurable Interest Requirement in the Life Insurance Secondary Market, 50 Tort Trial & Ins. Prac. L.J. 703, 724-29 (2015) (discussing the nationwide development and regulation of the secondary market).  Today, billions of dollars worth of policies are sold annually in the secondary market.  Lincoln Nat'l Life Ins. Co. v. Calhoun, 596 F. Supp. 2d 882, 885 (D.N.J. 2009).

Typically, people procure and pay premiums on a policy to plan for the future, but circumstances may change years later in ways that are distinct from

41

the previous hypotheticals.  Some policyholders may no longer need life insurance to protect a financially secure spouse or grown, self-supporting children; other insureds might need immediate cash for medical care or another urgent obligation.  If the insureds stopped paying the premiums, they and their beneficiaries "would get nothing."  See Martin, Betting on the Lives of Strangers, 13 U. Pa. J. Bus. L. at 186.  Instead, they can sell policies to strangers on the secondary market for a percentage of the policy's face value.  Provided the buyers continue to pay the premiums, they will eventually receive the death benefit.  Ibid.

Once again, policyholders in New Jersey, in certain cases, may also transfer a policy within two years, in accordance with the Viatical Settlements Act.  N.J.S.A. 17B:30B-10(a).

In any of those circumstances, buyers need not have an insurable interest in the life of the insured.

## V.

The first certified question poses a supplemental inquiry:  If the policy procured violates New Jersey's public policy, is it void ab initio?  Wells Fargo submits that when a fraud has been committed, "policies are merely voidable, not void" from the outset, under New Jersey law.  According to Wells Fargo,

42

that means that an "insurer may waive, or be estopped to raise, the fraud." Sun Life contends that a wagering policy is void ab initio.

When an insurance policy violates public policy, it is as though the policy never came into existence. See D'Agostino v. Maldonaldo, 216 N.J. 168, 194 n.4 (2013) ("A void contract is '[a] contract that is of no legal effect, so that there is really no contract in existence at all. A contract may be void because it is technically defective, contrary to public policy, or illegal." (quoting Black's Law Dictionary 374 (9th ed. 2009))); see also Vasquez v. Glassboro Serv. Ass'n, Inc., 83 N.J. 86, 98 (1980) ("No contract can be sustained if it is inconsistent with the public interest or detrimental to the common good."); Hebela v. Healthcare Ins. Co., 370 N.J. Super. 260, 270 (App. Div. 2004) ("[O]ur courts will decline to enforce an insurance policy, like any other contract, if its enforcement would be contrary to public policy.").[6]

We note as well that "[t]he vast majority of courts today that have interpreted STOLI contracts have held that such contracts are void ab initio

---

[6] Wells Fargo suggests that, because the fire insurance statute once stated that fire insurance policies would be void if the policyholder did not have sole and unconditional ownership of the property insured, see Flint Frozen Foods, Inc. v. Fireman's Ins. Co. of Newark, 8 N.J. 606, 611-12 (1952), the Legislature could have expressly said life insurance policies lacking an insurable interest were void, had it so intended. That type of declaration is not needed if a policy violates public policy.

from their inception."  Swisher, <u>Wagering on the Lives of Strangers</u>, 50 <u>Tort</u>
<u>Trial & Ins. Prac. L.J.</u> at 734.

The policy would be void from the outset.

## VI.

The second certified question asks, "If such a policy is void ab initio, is
a later purchaser of the policy, who was not involved in the illegal conduct,
entitled to a refund of any premium payments that they made on the policy?"
Sun Life contends that it should be permitted to retain the premiums it
collected because, "upon a determination that a policy is an illegal, void ab
initio wagering policy" -- as distinct from a voidable policy that is rescinded --
"New Jersey law requires that the court simply leave the parties where it finds
them."  Wells Fargo argues that "if any insurance policy is canceled or
rescinded in the State of New Jersey, the insurer must return the premium."

The traditional rule -- that courts leave the parties to a void contract as
they are rather than assist an illegal contract -- has evolved over time.
<u>Williston</u> discusses the more modern view and notes that equitable factors can
be considered to determine the proper remedy:

> In some cases, rescission of an illegal transaction
> and recovery of consideration are allowed where the
> parties are said not to be <u>in pari delicto</u>.

> The typical case in which this rule is applied is
> when one party acts under compulsion of the other.  The

doctrine originated in cases in which a creditor, by improper pressure, induced a debtor to enter into transactions fraudulent as to other creditors; now, generally, one who has been induced by fraud, coercion, or undue influence to convey property in fraud of creditors can rescind and recover it or its proceeds despite the illegality. In some other types of cases, the guilt of the parties is differentiated for other reasons, such as one party's lack of knowledge of the other party's illegal activities.

Probably no more exact principle can be laid down than if a plaintiff, although culpable, has not been guilty of moral turpitude, and the loss the plaintiff will suffer by being denied relief is wholly out of proportion to the requirements either of public policy or of appropriate individual punishment, the plaintiff may be allowed to recover back the consideration paid for an illegal agreement.

[8 Williston on Contracts § 19:80 (4th ed. 2019) (footnotes omitted).]

Williston notes situations in which the above doctrine has been applied to permit recovery by the less culpable party: "the purchaser of the consideration paid for securities sold in violation of securities acts"; "a purchaser of poisonous intoxicating liquor or some other product that was illegally sold"; and "money lost at gaming." Ibid. Williston adds that the principle has also "been extended by a number of courts to allow even affirmative recovery in limited settings" but notes that, "simply because the parties are not in equal fault, it does not mean that a court should automatically enforce the agreement at the behest of the less guilty party." Ibid.

45

The Seventh Circuit applied a similarly nuanced approach in <u>Davis</u> after it found the STOLI contracts in question were void.  803 F.3d at 910-11.  The court awarded the insurance company its attorney's fees and the premiums paid by all defendants except one investor, Egbert.  <u>Id.</u> at 911.  "Being to blame for the illegal contracts," the court reasoned, "the defendants have no right to recoup the premiums they paid to obtain them; allowing recoupment would, by reducing the cost, increase the likelihood of illegal activity."  <u>Ibid.</u>

As to Egbert, however, the court noted that "[h]e caused no harm," "was not involved in the conspiracy," and "would not have paid the premiums" had he known the policy was void.  <u>Ibid.</u>  Under the circumstances, it would "have have been a windfall" for the company to keep the premiums he paid.  <u>Ibid.</u> As a result, the court relied on an exception to the general rule -- to leave the parties where they are -- "for the case in which the party that made the payments is not to blame for the illegality."  <u>Ibid.</u>  The court concluded that Egbert's premium payments should be returned.  <u>Id.</u> at 911-12.

In <u>Conestoga</u>, the Eastern District of Tennessee found that the sixth assignee of a void STOLI policy was entitled to a refund of the premiums it paid.  263 F. Supp. 3d at 697, 704.  The court stressed that the assignee was "not to blame for the fraud here" and based its holding on the "rule that an assignee who has paid premiums in good faith is entitled to recover premiums

paid if the policy is later declared void because of the misconduct of others."
Ibid. (collecting cases).

The United States District Court for the District of Nevada likewise considered the relative culpability of the parties in a matter that involved a "textbook STOLI arrangement."  See Carton v. B & B Equities Grp., LLC, 827 F. Supp. 2d 1235, 1239-40, 1247 (D. Nev. 2011).  The court noted "[t]he Insurers were the clear victims of the STOLI scheme."  Id. at 1247.  The original investors, in contrast, who "may have . . . been duped," "were at least on inquiry notice of the illicit scheme."  Ibid.  The court pointed to several "red flags [that] should have placed" them on notice.  Ibid.  "Because it would be unjust" to reward the investors under those circumstances, the court concluded they "failed to state a claim for unjust enrichment" and were not entitled to a refund of the premiums they funded.  Ibid.

In the context of a void STOLI policy, the fact-sensitive approach outlined by Williston and adopted in the above cases is sound.  To decide the appropriate remedy, trial courts should develop a record and balance the relevant equitable factors.  Those factors include a party's level of culpability, its participation in or knowledge of the illicit scheme, and its failure to notice red flags.  Depending on the circumstances, a party may be entitled to a refund

of premium payments it made on a void STOLI policy, particularly a later purchaser who was not involved in any illicit conduct.

We note that the District Court considered equitable principles and fashioned a compromise award based on the record before it. We do not comment on the award itself.

## VII.

For the reasons set forth above, we answer both parts of the first certified question in the affirmative:  a life insurance policy procured with the intent to benefit persons without an insurable interest in the life of the insured does violate the public policy of New Jersey, and such a policy is void at the outset.  In response to the second question, we note that a party may be entitled to a refund of premium payments it made on the policy, depending on the circumstances.


JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in CHIEF JUSTICE RABNER's opinion. JUSTICE ALBIN did not participate.